COMMONWEALTH *vs.* LAWRENCE A. BRUNO.
COMMONWEALTH *vs.* CARLOS L. DAVILA.
COMMONWEALTH *vs.* JAMES D. WILSON
(and a consolidated case).

Plymouth. Middlesex. May 2, 2000. - September 29, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, SPINA, & COWIN, JJ.

*Sex Offender. Practice, Civil,* Sex offender. *Statute,* Retroactive statute. *Constitutional Law,* Ex post facto law, Sex offender. *Due Process of Law,* Sex offender, Substantive rights. *Collateral Estoppel. Moot Question. Evidence,* Sex offender, Expert opinion. *Probable Cause.*

Discussion of G. L. c. 123A, as amended by St. 1999, c. 74, §§ 3-8, providing for the civil commitment of a person adjudged to be a "sexually dangerous person," as defined therein. [494-497]

This court concluded that G. L. c. 123A, as amended by St. 1999, c. 74, §§ 3-8, operates prospectively, where a defendant's current mental condition, occurring on or after the statute's effective date, triggers the statute's application. [497-499]

This court concluded that G. L. c. 123A, as amended by St. 1999, c. 74, §§ 3-8, a civil statute, neither was punitive in intent or effect, nor constituted an ex post facto law, where it was intended to be remedial, was not retributive, and did not function as a deterrent. [499-502]

The provisions of G. L. c. 123A, as amended by St. 1999, c. 74, §§ 3-8, permit temporary civil commitment, in narrowly circumscribed circumstances, of persons who are soon to be released from prison, who are likely to be sexually dangerous, to protect the legitimate and compelling public interest in preventing harm by such persons, and provide ample procedural protections to those subjected to potential commitment; therefore, the statute does not violate substantive due process rights. [502-504]

The Commonwealth was not collaterally estopped from filing a petition for civil commitment, pursuant to G. L. c. 123A, as amended by St. 1999, c. 74, §§ 3-8, of a prisoner serving a sentence for rape by reason of a prior dismissal of a petition for commitment under a former version of c. 123A under which no adjudication was made; further, there were additional reasons supporting the present petition beyond those advanced in the prior petition. [504-506]

This court concluded that the standard of proof ("sufficient showing") required to commit a person temporarily under G. L. c. 123A, § 12 (*e*), is probable cause to arrest, and declined to adopt a "special needs" exception to the probable cause requirement [507-508]; further, the Commonwealth's burden of proof at the probable cause hearing under G. L. c. 123A, § 12 (*c*), is the same as that required for a probable cause, or bind-over, hearing held pursuant to G. L. c. 276, § 38, that is, "directed verdict" standard [509-510].

This court stated that probable cause to commit a person temporarily under
   G. L. c. 123A, § 12 (*e*), exists when sufficient expert evidence is presented
   at the ex parte hearing as to each element of proof, assuming it is true, to
   warrant a judge in believing that the person is a sexually dangerous person.
   [510-511]

This court stated that a temporary commitment under G. L. c. 123A, § 12 (*e*),
   made without the production of sufficient expert evidence may be of a
   twenty-four hour duration only. [511]

This court stated that, absent unusual circumstances, a probable cause hearing
   under G. L. c. 123A, § 12 (*c*) and (*d*), should commence no later than ten
   business days after a temporary commitment order is made under § 12 (*e*)
   [511-513], and further, that expert testimony is required at a probable
   cause hearing [513].

There was no basis in the record of proceedings below for this court to
   determine whether persons committed under G. L. c. 123A, §§ 12 (*e*), and
   13 (*a*), must be held separately from persons adjudged sexually dangerous.
   [513-514]

PETITION filed in the Superior Court Department on September 20, 1999.

A motion to dismiss filed by the defendant Bruno was heard by *Charles J. Hely*, J.

The Supreme Judicial Court granted an application for direct appellate review.

PETITION filed in the Superior Court Department on October 8, 1999.

A motion to dismiss filed by the defendant Wilson was heard by *Isaac Borenstein*, J.; questions of law were reported by him to the Appeals Court; and a motion to stay the defendant's release from commitment was heard in the Appeals Court by *Kenneth Laurence*, J.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on January 10, 2000.

The matters were heard by *Ireland*, J., and the appeals pending in the Appeals Court were ordered consolidated and transferred to this court by him.

PETITION filed in the Superior Court Department on October 20, 1999.

A motion to dismiss filed by the defendant Davila and a motion to stay the defendant's release from commitment were heard by *Margot Botsford*, J.

On a second motion to stay the defendant's release, the matter was heard in the Appeals Court by *Kenneth Laurence*, J.

The case was transferred to this court by an order of *Ireland,* J., sitting as single justice, on the Commonwealth's petition under G. L. c. 211, § 3.

*Gail M. McKenna, Kimberly M. Diaz, & Margaret A. Peterson,* Assistant District Attorneys (*Sean Gordon,* Assistant District Attorney, with them) for the Commonwealth.

*Nona E. Walker,* Committee for Public Counsel Services (*Anne E. Gowen & Stan Goldman,* Committee for Public Counsel Services, with her) for the defendants.

The following submitted briefs for amici curiae:

*John Reinstein, Mark J. Gillis, Stan Goldman, Gary Rothberger, & Peter Costanza* for the American Civil Liberties Union of Massachusetts & others.

*Thomas F. Reilly,* Attorney General, *Joseph T. Thai, & Pamela L. Hunt,* Assistant Attorneys General, for the Attorney General & others.

SPINA, J. In these cases, we decide whether the provisions of G. L. c. 123A, as amended through St. 1999, c. 74, §§ 3-8,[1] that provide for the civil commitment of sexually dangerous persons, apply to persons such as the three defendants, whose convictions of sexual offenses predate September 10, 1999, the effective date of St. 1999, c. 74. On September 10, 1999, each of the defendants was serving his respective sentence on the sexual offense of which he was previously convicted, and was scheduled to be released from prison shortly thereafter.[2] On the day before their scheduled releases, the Commonwealth filed petitions in the Superior Court seeking each defendant's commitment as a sexually dangerous person.[3] After being temporarily committed, each of the defendants moved to dismiss the petition filed against him. The defendants argued that the 1999 version of

[1]General Laws c. 123A, as amended through St. 1999, c. 74, §§ 3-8, has remained unchanged since the 1999 amendments.

[2]Bruno was scheduled for release on September 21, 1999, after completing a ten-to-twenty-year sentence imposed on November 2, 1981, for aggravated rape. Davila was scheduled for release on October 21, 1999, after completing a two and one-half year sentence for an indictment charging rape, to which he had pleaded guilty on November 10, 1997. Wilson was scheduled for release on October 9, 1999, after completing a six-to-ten-year sentence imposed on November 7, 1990, on his conviction of indecent assault and battery on a child under fourteen years, second and subsequent offense.

[3]The Department of Correction (department) notified the district attorney's office only three days before Davila's scheduled release, and just the day before Wilson's scheduled release. The department could not give the requisite

c. 123A violated various State constitutional provisions, or that the definition of sexually dangerous persons in c. 123A, § 1, did not apply to persons who had not been convicted of a sexual offense on or after the effective date of the 1999 amendments. The judge in each case did not decide the constitutional claims, but rather concluded that the defendant could not be subjected to potential commitment under c. 123A because his prior conviction of a sexual offense predated the effective date of the 1999 amendments, and on that basis, allowed the motion to dismiss.[4] The Commonwealth appealed from each order of dismissal. Pending our determination of these cases, Davila and Wilson have remained committed. We conclude that civil commitment proceedings under c. 123A were properly initiated against the defendants, whose convictions for sexual offenses predate the effective date of the 1999 amendments. We reject the defendants' constitutional claims that c. 123A violates their rights to be protected from ex post facto lawmaking, as well as their due process rights.

We also consider whether Bruno's due process rights were violated by the Commonwealth's recent attempt to have him committed, where he previously had been evaluated by two psychiatrists who opined that he was not a sexually dangerous person under an earlier version of c. 123A. We conclude that, where Bruno had not been adjudged not sexually dangerous, and where the Commonwealth's recent commitment petition was not predicated solely on the grounds on which the prior

---

six months' notice pursuant to G. L. c. 123A, § 12 (*a*), because that provision had only recently taken effect. See St. 1999, c. 74 § 8.

[4]In addition to allowing Wilson's motion to dismiss, the judge reported the following questions: "Does G. L. c. 123A apply only to persons convicted of sexual offenses after September 10, 1999?"; [and] "If the answer to [that question] is no, and G. L. c. 123A does apply retroactively to persons convicted of sexual offenses before September 10, 1999, does G. L. c. 123A violate the ex post facto provisions of the United States Constitution, art. 1, [§ ] 10, or [a]rt. 24 of the Massachusetts Declaration of Rights?" In reviewing the appeals from the dismissals in these cases, we resolve the issues posed by these questions, and thus, do not separately answer them. We note that with respect to the second question, although we have not been asked on appeal to decide whether various features of G. L. c. 123A violate the ex post facto clause under the Federal Constitution, because we have "treated the ex post facto provisions within the State and Federal Constitutions in identical fashion," see *Santiago* v. *Commonwealth*, 427 Mass. 298, 301, *S.C.*, 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), the result would be the same result that we reach under the Massachusetts Declaration of Rights.

commitment petition was based, the Commonwealth did not violate Bruno's due process rights by recently filing a petition to commit Bruno as a sexually dangerous person.

Last, we consider the propriety of an order committing Wilson to the treatment center for examination and diagnosis for a period not to exceed sixty days. This order was entered by the judge before he allowed Wilson's motion to dismiss. The judge, after hearing, committed Wilson because he found probable cause existed that Wilson was a sexually dangerous person. The judge then reported his order as well as six questions of law to the Appeals Court pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996), and G. L. c. 231, § 111.[5] A

---

[5]The judge might simply have reported the question whether his order finding probable cause was proper. See *McStowe* v. *Bornstein*, 377 Mass. 804, 805 n.2 (1979). "Although a judge may report specific questions of law in connection with an interlocutory finding or order, the basic issue to be reported is the correctness of his finding or order. Reported questions need not be answered in this circumstance except to the extent that it is necessary to do so in resolving the basic issue." *Id.*

The six questions reported are:

"(1) Is the same probable cause to arrest standard, which is required to be reviewed by a judicial officer within twenty-four (24) hours after a person's detention, under *Jenkins* v. *Chief Justice of the Dist. Court*, 416 Mass. 221, 242 (1993), also applicable when, pursuant to G. L. c. 123A, § 12 (*e*), a petition is filed requesting an initial, temporary commitment of an alleged Sexually Dangerous Person (SDP) pending the probable cause hearing?

"(2) Is the Commonwealth required to submit forensic evidence in support of the claim that the defendant has a mental abnormality or personality disorder as defined by G. L. c. 123A, § 1, at the time it files a petition under G. L. c. 123A, § 12 (*e*) for the initial, temporary commitment of an SDP pending the probable cause hearing?

"(3) If the answer to question two (2) is no, must the Commonwealth provide forensic evidence in support of the claim that the defendant has a mental abnormality or personality disorder as defined by G. L. c. 123A, § 1, at any time before the probable cause hearing, in order to continue to temporarily commit a defendant pursuant to G. L. c. 123A, § 12 (*e*)?

"(4) If the answer to question three (3) is no, pursuant to G. L. c. 123A, § 12 (*e*), how long may a person be temporarily committed before a probable cause hearing is held?

"(5) Under G. L. c. 123A, § 13 (*a*), must the Commonwealth present forensic evidence at the probable cause hearing in support of the claim that the defendant has a mental abnormality or personality disorder, as defined by G. L. c. 123A, § 1?

"(6) Should alleged sexually dangerous persons who are temporarily committed pending their probable cause hearing, and/or after a finding of probable

single justice of this court, pursuant to G. L. c. 211, § 4A, transferred the report, together with the Commonwealth's appeal from the order allowing Wilson's motion to dismiss, from the Appeals Court to this court.[6] We affirm the order of commitment and address the reported questions.

We first provide an overview of the statute. On September 10, 1999, the Legislature enacted emergency legislation, St. 1999, c. 74, §§ 3-8, amending c. 123A by providing for the one day to life commitment of a person adjudged a "sexually dangerous person."[7] Prior to these amendments, for a period of almost ten years, no new "sexually dangerous person" classifications and no new commitments were permitted. See St. 1990, c. 150, § 304 (repealing G. L. c. 123A, §§ 3-6, and 7).[8] The 1999 amendments established a new definition of a sexually dangerous person, see G. L. c. 123A, § 1, and five new sections, see G. L. c. 123A, §§ 12-16, concerning the procedures for adjudicating persons as sexually dangerous.

As amended through St. 1999, c. 74, § 6, a "sexually dangerous person" is defined in G. L. c. 123A, § 1, as:

> "any person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility; (ii) charged with a sexual offense and was determined to be incompetent to stand trial and who suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility; or (iii) previously adjudicated as [sexually dangerous] by a court of the commonwealth and whose misconduct in sexual matters

cause, be held separately from persons already adjudicated to be sexually dangerous persons?"

[6]The single justice also ordered these appeals consolidated.

[7]Persons ordered committed pursuant to the provisions of c. 123A are confined to a treatment center, which is an institution established for their "care, custody, treatment and rehabilitation." G. L. c. 123A, § 2. It is to be maintained by the Commissioner of Correction, subject to the Department of Correction's jurisdiction. *Id.*

[8]The sections of c. 123A governing the treatment of persons committed to the treatment center prior to the repeal of G. L. c. 123A, §§ 3-6, and 7, remained in effect. See St. 1990, c. 150, § 104.

indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires."

Statute 1999, c. 74, § 4, inserted definitions for the terms "[m]ental abnormality" and "[p]ersonality disorder." A "[m]ental abnormality" is defined as "a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." G. L. c. 123A, § 1. A "[p]ersonality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." *Id.* The definition of the term "sexual offense" identifies various specifically enumerated crimes, including, undisputedly, the crimes of which the defendants were convicted. *Id.* See note 2, *supra*.

The new commitment procedures, as applied to persons such as the defendants who have been convicted of a sexual offense, require "[a]ny agency with jurisdiction" over such persons, or custodial agency, to "notify in writing the district attorney of the county where the offense occurred and the attorney general six months prior to the release of such person." G. L. c. 123A, § 12 (*a*). If the district attorney or Attorney General then "determines that the prisoner . . . is likely to be a sexually dangerous person as defined in section 1 [of c. 123A]," either "may file a petition alleging that the prisoner . . . is a sexually dangerous person and *stating sufficient facts to support such allegations* in the superior court." *Id.* at § 12 (*b*).

"Upon the filing of a petition," the court must "determine whether probable cause exists to believe that the person named in the petition is a sexually dangerous person." G. L. c. 123A, § 12 (*c*). Such person is entitled to notice and a hearing, together with the right to be represented by counsel, to present evidence, to cross-examine witnesses, and to view and copy all petitions and reports in the court's file. *Id.* at § 12 (*c*), (*d*). If the person is scheduled to be released "prior to the court's probable cause determination, the court, upon a sufficient show-

ing based on the evidence before the court at that time, may temporarily commit such person . . . pending disposition of the petition." *Id.* at § 12 (*e*). The person may move for relief from such commitment. *Id.*

If the court finds probable cause to believe that the person is sexually dangerous, he may be committed "for a period not exceeding [sixty] days for the purpose of examination and diagnosis under the supervision of two qualified examiners." G. L. c. 123A, § 13 (*a*). No later than fifteen days before the expiration of the sixty-day examination period, the qualified examiners must "file with the court a written report of the examination and diagnosis and their recommendation of the [person's] disposition." *Id.* The person may retain his own expert, and if indigent, "the court shall provide for such qualified examiner." *Id.* at § 13 (*d*).

Within fourteen days of the filing of the qualified examiners' reports, the district attorney or Attorney General "may petition the court for a trial . . . to determine whether [the] person is a sexually dangerous person." G. L. c. 123A, § 14 (*a*). Trial must commence within sixty days from the date that the petition is filed unless good cause is shown or the interests of justice so require. *Id.* To prepare for trial, the person is entitled to the assistance of counsel and may retain "experts or professional persons to perform an examination on his behalf" and to examine "all relevant medical and psychological records" concerning the person. *Id.* at § 14 (*b*). If the person is indigent, the State shall provide him with counsel and experts. *Id.* If the person intends to use the testimony or report of his qualified examiner, he must file the examiner's report with the court, and provide the district attorney and Attorney General with a copy, "no later than ten days prior to the scheduled trial." *Id.*

During the trial, the person "shall be confined to a secure facility." G. L. c. 123A, § 14 (*a*). If the jury unanimously find "beyond a reasonable doubt" that the person is a sexually dangerous person, he will be committed from one day to life, until discharged. *Id.* at § 14 (*d*). The effective date of the order of commitment is the person's "date of discharge from jail, the house of correction, [or] prison." *Id.* If the person is scheduled to be released from jail or prison "at any time prior to the final judgment, the court may temporarily commit such person . . . pending disposition of the petition." *Id.* at § 14 (*e*).

A person committed under § 14 (*d*) "shall be entitled to file

a petition for examination and discharge once in every twelve months." G. L. c. 123A, § 9. At any time, the Department of Correction (department) may file a discharge petition "if it believes a person is no longer a sexually dangerous person." *Id.* The right to a speedy hearing is afforded to the petitioner, and at any such hearing, either the petitioner or the Commonwealth may demand a jury trial. *Id.* On the committed person's motion, or on its own motion, the court "shall appoint counsel" for the committed person. *Id.*

Prior to a trial or dispositive hearing, the court "shall order [the committed person] to be examined by two qualified examiners." G. L. c. 123A, § 9. The examiners are obligated to conduct "examinations, including personal interviews," of the committed person, and must file written reports of their "examinations and diagnoses, and their recommendations for the [committed person's] disposition." *Id.* If the committed person "without good cause" refuses to be personally interviewed by a qualified examiner, "such person shall be deemed to have waived his right to a hearing on the petition and the petition shall be dismissed upon motion filed by the commonwealth." *Id.* "Unless the trier of fact finds that such person remains a sexually dangerous person, it shall order such person to be discharged." *Id.*

1. *Retroactivity.* The defendants maintain that the application of the amended c. 123A to them is unconstitutional because it was triggered by an event, namely, a conviction of a sexual offense, that occurred before its effective date. They assert that the statute may only be applied to persons (unlike themselves) whose convictions of sexual offenses occur on or after the effective date of the 1999 amendments. We disagree because we conclude that the statute operates prospectively.

There is no dispute that the requisite convictions of sexual offenses in these cases occurred before the effective date of the 1999 amendments to c. 123A, and that absent these prior sexual offense convictions, the defendants could not be subjected to potential commitment as sexually dangerous persons. Those facts, however, do not render the statute retroactive. In determining whether a statute operates retroactively or prospectively, the whole statute, and here, the entire definition of the term "sexually dangerous person" as well must be considered. 2 N.J. Singer, Sutherland Statutory Construction § 41.04, at 350 (5th ed. 1993). When the conduct triggering the statute's application

occurs on or after its effective date, the statute's application is deemed prospective, and therefore permissible. See *McCarthy* v. *Sheriff of Suffolk County*, 366 Mass. 779, 781 (1975); *Merchants Nat'l Bank* v. *Merchants Nat'l Bank*, 318 Mass. 563, 571 (1945). See also *McAndrews* v. *Fleet Bank*, 989 F.2d 13, 16 (1st Cir. 1993).

Here, the conduct triggering the statute's application is not the prior conviction of a sexual offense, but the current mental condition of a defendant. See G. L. c. 123A, § 1 (definition of "[s]exually dangerous person"); § 12 (*b*). The focus of the definition of "sexually dangerous person" and the statute's various sections relating to the procedures governing commitment is a defendant's current mental condition.

That a person, in addition to possessing the requisite current mental condition, must have been convicted of a sexual offense, only identifies and limits the class of persons subject to potential commitment under c. 123A. "The [L]egislature may, of course, choose to classify or reclassify a thing, and provided the new definition is applied only to determine status for the purpose of matters arising in the future, the prohibition on retroactive laws is not violated. A law is not made retroactive because it alters the existing classification of a thing. Nor is a law retroactive if it draws upon antecedent facts for its operation." *United States Envtl. Protection Agency* v. *New Orleans Pub. Serv., Inc.*, 826 F.2d 361, 365 (5th Cir. 1987). See *McCarthy* v. *Sheriff of Suffolk County*, *supra*. See also 2 N.J. Singer, Sutherland Statutory Construction, *supra* at § 41.01, at 338 ("a statute is not rendered retroactive merely because the facts upon which its subsequent action depends are drawn from a time antecedent to its effective date"). Because the requisite sexual offense convictions determine only the persons eligible for potential civil commitment, and is not the basis for commitment, the statute is not retroactive in application.

Our conclusion does not contradict the "new consequence" formulation of retroactivity, under which a court must ask "whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 270 (1994). That inquiry is not simply a determination whether the new statutory provision effects an unanticipated consequence, but "a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and

a relevant past event." *Id.* While "[a]ny test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity," *id.,* we are satisfied that the statute, with its focus on a person's current mental condition, does not operate retroactively. Our conclusion obviates the need to address the defendants' remaining arguments concerning the retroactive application of the statute.

2. *Ex post facto law.* The defendants argue that various features of c. 123A render the statute punitive in both intent and effect, and thus, an unconstitutional ex post facto law under art. 24 of the Massachusetts Declaration of Rights.[9] They point to the following features of the statute as punitive: (1) the commitment and treatment occurs after a sexually dangerous person has served his sentence, see G. L. c. 123A, § 14 (*d*)[10]; (2) the statute does not permit less restrictive alternatives to commitment; and (3) the treatment center is operated by the department, see *id.* at § 2, instead of the Department of Mental Health, as previously had been the case.[11] We reject these contentions. The statute is neither punitive in intent or effect, nor does it constitute an ex post facto law.

In support of their arguments, the defendants rely principally on the dissenting opinion in *Kansas* v. *Hendricks,* 521 U.S. 346, 373 (1997) (Breyer, J., dissenting). There the Supreme Court of the United States reversed the judgment of the Supreme Court of Kansas, and upheld as constitutional the Sexually Violent Predator Act, see Kan. Stat. Ann. §§ 59-29a01 et seq. (1994) (Kansas statute), which contains many provisions similar to those in c. 123A. *Id.* at 350, 371. The Court considered, among

[9]The defendants do not argue that the statute violates the prohibition against ex post facto laws under the Federal Constitution. They do argue that the Superior Court judge's conclusion that the Massachusetts Declaration of Rights provides greater protection against ex post facto legislation by virtue of an amalgam of arts. 10 and 24 should be affirmed. They draw on the dissenting opinion in *Kansas* v. *Hendricks,* 521 U.S. 346, 373 (1997) (Breyer, J., dissenting). "Our cases have treated the ex post facto provisions of the State and Federal Constitutions in identical fashion." *Santiago* v. *Commonwealth,* 427 Mass. 298, 301 (1998). These cases provide no reason to depart from that view.

[10]Under the last applicable version of the statute, a person adjudged a "sexually dangerous person" and committed, served his sentence "concurrently with the commitment." G. L. c. 123A, §§ 5, 9, as appearing in St. 1985, c. 752, § 1 (repealed by St. 1990, c. 150, § 304).

[11]See G. L. c. 123A, § 2, as appearing in St. 1985, c. 752, § 1.

other issues, whether the Kansas statute violated the Federal Constitution's prohibition on ex post facto lawmaking. *Id.* at 361. We find the Court's analysis instructive here. See *Santiago* v. *Commonwealth*, 427 Mass. 298, 301, *S.C.*, 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

The defendants acknowledge that only a criminal or penal statute could potentially constitute an ex post facto law. Whether a statute was intended to be criminal or civil depends on the Legislature's intent, which is a matter of statutory construction. *Kansas* v. *Hendricks, supra* at 361. If a statute was intended to be civil, then it is penal "only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Id.*, quoting *United States* v. *Ward*, 448 U.S. 242, 248-249 (1980). See *Powers* v. *Commonwealth*, 426 Mass. 534, 537-538 (1998). The defendants fall short of satisfying this high burden.

The Legislature intended the current version of c. 123A, as with former versions, to be remedial. See *Commonwealth* v. *Tate*, 424 Mass. 236, 239, cert. denied, 522 U.S. 832 (1997); *Hill, petitioner*, 422 Mass. 147, 153-154, cert. denied, 519 U.S. 867 (1996); *Commonwealth* v. *Barboza*, 387 Mass. 105, 111-112, cert. denied, 459 U.S. 1020 (1982). Statute 1999, c. 74, is entitled "An Act . . . establishing *civil* commitment" (emphasis added). See *Kansas* v. *Hendricks, supra* at 361. Persons committed are committed to a treatment center providing for their "care, custody, treatment and rehabilitation." G. L. c. 123A, § 2. Further, c. 123A retains its place among public welfare chapters of the General Laws. See *Kansas* v. *Hendricks, supra* at 361. The Legislature left intact the statute's title, "Care, Treatment and Rehabilitation of Sexually Dangerous Persons." St. 1958, c. 646, § 1. These facets of the statute, together with its stated purpose, "to protect forthwith the vulnerable members of our communities from sexual offenders," see St. 1999, c. 74, emergency preamble, underscore the dual goals of the amendments, namely, to protect the public from sexually dangerous persons, and to provide them treatment, and rehabilitation. Cf. *Commonwealth* v. *Barboza, supra*. Because the Legislature intended to establish a remedial scheme, the statute is deemed "nonpunitive and therefore civil." *Powers* v. *Commonwealth, supra* at 538. See *Kansas* v. *Hendricks, supra* at 361.

The statute's scheme has not been shown to be so punitive in

purpose or effect as to negate the Legislature's remedial intention. See *id.*; *Doe* v. *Attorney Gen. (No. 2)*, 425 Mass. 217, 220 (1997). As to the statute's purpose, it is neither retributive, nor does it function as a deterrent. See *Kansas* v. *Hendricks, supra* at 361-362. It is not retributive because "it does not affix culpability for prior criminal conduct." *Id.* at 362. As we previously explained, the statute's requirement, in the cases of the defendants, of a conviction of a sexual offense, is not the basis for commitment, but rather merely identifies and limits the class of persons subject to commitment proceedings under c. 123A. Consequently, "the fact that the [statute] may be 'tied to criminal activity' is 'insufficient to render [the statute] punitive.'" *Id.*, quoting *United States* v. *Ursery*, 518 U.S. 267, 292 (1996). In addition, because commitment is based on a person's current mental condition, and no finding of scienter is required to commit the person, the statute is not retributive. See *Kansas* v. *Hendricks, supra* at 362. Last, by the nature of their current mental condition, those persons committed under the statute are "unlikely to be deterred by the threat of confinement." *Id.* at 362-363. See *Hill, petitioner, supra* at 154 (commitment "does not serve as . . . deterrent measure").

The three features of the statute on which the defendants rely, when viewed against the entire statutory scheme, do not render the statute punitive. While the dissenting opinion in the *Hendricks* case opined that the requirement of completion of a sentence prior to commitment under the Kansas statute makes "a legislative scheme . . . look punitive," it acknowledged a counter-argument that a State "should be permitted to postpone treatment until after punishment in order to make certain that the punishment in fact occurs." *Id.* at 381, 386 (Breyer, J., dissenting). Statutory history suggests this concern may be what the Legislature had in mind when enacting St. 1999, c. 74, § 8. Under prior versions of c. 123A, a sexually dangerous person would be committed concurrent with serving his sentence, St. 1985, c. 752, § 1, or could, in lieu of serving his sentence, be committed, St. 1958, c. 646, § 1. While the dissent in *Kansas* v. *Hendricks, supra* at 386 (Breyer, J., dissenting), rejected the counter-argument, it did so because "[m]uch of the treatment that Kansas offered [in connection with commitment] can be given at the same time as, and in the same place where, [the defendant] serves his punishment." The Supreme Court did not decide whether the Federal Constitution requires States to offer

inmates sex offender treatment while incarcerated for a subsequent civil commitment to be valid as nonpunitive. We do not decide this question because the defendants made no claim in the trial court that treatment was not or would not be available when they serve their punishment. The issue is therefore not before us.

That c. 123A does not provide less restrictive alternatives to commitment, such as "postrelease supervision [or] halfway houses," see *Kansas* v. *Hendricks, supra* at 387 (Breyer, J., dissenting), does not render the statute punitive. To the contrary, those persons subjected to confined commitment have been found either to be "likely to engage in sexual offenses if not confined to a secure facility," or to have "a general lack of power to control . . . sexual impulses . . . and . . . likely to attack or otherwise inflict injury." G. L. c. 123A, § 1. Thus, because such persons are likely to commit future harm, confined commitment appears to be the only viable form of commitment.

Last, the fact that treatment for committed persons is provided at a treatment center operated under the auspices of the department of correction does not render the commitment penal in nature. We previously rejected such a claim under an earlier different version of the statute. See *Commonwealth* v. *Tate, supra* at 238-239. Further, the defendants do not dispute that sexually dangerous persons are kept apart from the criminal population in the treatment center. Nor do they dispute that under the statute they only can remain committed while they possess the requisite mental condition. If the trier of fact finds that a person is no longer sexually dangerous, the department of correction must release that person.[12]

3. *Due process.* While commitment proceedings under c. 123A are civil proceedings, the potential deprivation of liberty to those persons subjected to these proceedings "mandates that due process protections apply." *Commonwealth* v. *Travis,* 372 Mass. 238, 250 (1977). The defendants argue that temporary commitment of an indeterminate duration pending a probable cause hearing, pursuant to G. L. c. 123A, § 12 (*e*), violates their substantive due process rights because the temporary

---

[12]We also reject, for reasons already discussed, the defendants' conclusory assertion that an analysis of the factors listed in *Kennedy* v. *Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963), would compel the same conclusion the dissent in *Kansas* v. *Hendricks,* 521 U.S. 346, 394 (1997) (Breyer, J., dissenting), reached.

restraint does not occur in narrowly circumscribed situations. They maintain that the temporary restraint is not imposed in narrowly circumscribed situations because the "district attorneys' discretion to initiate proceedings is not informed by meaningful guidelines; a district attorney can file a petition for commitment of any person who has been convicted of a single sex offense." The defendants also claim that this lack of guidelines violates their procedural due process rights. We reject these contentions.

" ' " [S]ubstantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin* v. *California*, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko* v. *Connecticut*, 302 U.S. 319, 325-326 (1937).' *United States* v. *Salerno*, 481 U.S. 739, 746 (1987)." *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993). Where, as here, the right involved, freedom from physical restraint, is "fundamental," we " 'must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation,' *Moore* v. *East Cleveland*, 431 U.S. 494, 499 (1977)." *Id.* See *id.* at 674 & n.10. That right "is not absolute." *Kansas* v. *Hendricks, supra* at 356. A State "may impose a regulatory restraint on the individual in narrowly-circumscribed situations." *Aime* v. *Commonwealth, supra* at 677-678. The statute imposing the restraint may be upheld only if it is "narrowly tailored to further a legitimate and compelling governmental interest." *Id.* at 673.

The defendants mistakenly argue that under the statute, a district attorney may file a petition to commit anyone who has been convicted of a sexual offense. As previously explained, while such a conviction is required before commitment proceedings may be initiated, commitment proceedings turn on a person's current mental condition. A district attorney cannot file a petition to commit a person unless it is "likely" that the person possesses the requisite mental condition under the statute. G. L. c. 123A, § 12 (*b*). This determination must be supported by "sufficient facts," and not merely averred. *Id.* A person is not temporarily committed under G. L. c. 123A, § 12 (*e*), simply on the filing of a petition. Rather, the Commonwealth must make a "sufficient showing" based on "evidence before the court," that the person named in the petition is sexually dangerous, *id.*, and that the person is likely to commit future

harm. *Id.* at § 1. Also, the statute carefully limits when temporary commitment may be sought. It may only be sought when the person named in the petition is scheduled for release prior to the probable cause hearing. *Id.* at § 12 (*e*). A person temporarily committed is committed to a treatment center. *Id.* ` He does not remain incarcerated. These particular features of the temporary commitment scheme reflect the Legislature's concern with protecting the public from harm by persons who are soon to be released *and* who are likely to be sexually dangerous. The defendants do not dispute that this interest is both legitimate and compelling. See *United States* v. *Salerno,* 481 U.S. 739, 747 (1987) ("preventing danger to the community is a legitimate regulatory goal"). Further, the person named in the petition may challenge the "showing" and resulting temporary commitment. He "may move the court for relief from such temporary commitment at *any time* prior to the probable cause determination" (emphasis added). G. L. c. 123A, § 12 (*e*). Thus, if the Commonwealth fails to satisfy its burden, the person may not be temporarily committed. The statute permits temporary commitment only in narrowly circumscribed circumstances, and thus, does not violate the defendants' substantive due process rights.

The lack of guidelines to district attorneys does not deprive the defendants of procedural due process. Procedural due process "requires that a statute or governmental action that has survived substantive due process scrutiny be implemented in a fair manner." *Aime* v. *Commonwealth, supra* at 674. The statute provides ample procedural protections to those subjected to potential commitment, and therefore, does not violate the defendants' procedural due process rights.

4. *Bruno's claim of collateral estoppel.* Bruno asserts that the Commonwealth violated his due process rights because it initiated commitment proceedings against him after two psychiatrists previously had concluded that he was not sexually dangerous under a former version of c. 123A. In November, 1981, Bruno was convicted of aggravated rape. In May, 1985, while Bruno was serving his sentence, the superintendent of the Massachusetts Correctional Institution at Norfolk (M.C.I., Norfolk), moved, pursuant to G. L. c. 123A, § 6, to have Bruno committed to the treatment center for a period not to exceed sixty days

to determine whether he was a sexually dangerous person.[13] Subsequently, Bruno was committed and examined by two psychiatrists. Each psychiatrist concluded that Bruno was not a sexually dangerous person, and, on January 9, 1986, Bruno was returned to M.C.I., Norfolk to serve the remainder of his sentence. In 1989, the commitment petition was dismissed for lack of prosecution. On September 20, 1999, the day before Bruno completed serving his sentence on the rape conviction, the Commonwealth filed a petition again seeking his commitment under c. 123A, as recently amended. The judge never reached this issue because he decided the case on the issue of retroactivity.

Bruno principally relies on *Commonwealth* v. *Travis, supra.* Unlike Bruno, Travis had been committed to the treatment center for one day to life. After a hearing on his petition for discharge Travis was *adjudged* to be no longer sexually dangerous and ordered conditionally released. He was recommitted for breach of the conditions of his release, but not before the judge vacated his earlier finding that Travis was no longer sexually dangerous. *Id.* at 239, 241. The court concluded that "as a matter of fundamental fairness under the due process clause of the Fourteenth Amendment to the United States Constitution, a finding that an individual is no longer sexually dangerous must be as immune from subsequent or collateral attack as is a criminal judgment of acquittal." *Id.* The court, however, limited its holding "only to circumstances in which there has been a finding [pursuant to a § 5 proceeding] that an individual is not sexually dangerous at that particular time and a subsequent or collateral attack is made on that finding as it relates to the individual's status at the time the finding was made." *Id.* at 249 n.5. See *Gomes* v. *Gaughan,* 471 F.2d 794, 797 (1st Cir. 1973) (due process issues may arise where person, after having been found or adjudicated not sexually dangerous, and in "absence of intervening misbehavior," is subjected to subsequent commitment proceeding).

The Commonwealth does not seek to commit Bruno based on the same grounds on which the superintendent relied in 1985. Contrary to Bruno's assertion that "there has been no 'interven-

---

[13]In accordance with G. L. c. 123A, § 6, as amended by St. 1978, c. 478, § 72 (repealed by St. 1990, c. 150, § 304), the superintendent's motion was accompanied by two reports of a psychiatrist, who concluded that Bruno might be a sexually dangerous person.

ing misbehavior,' " see *Gomes* v. *Gaughan, supra* at 797, the Commonwealth's current petition is not predicated only on Bruno's prior criminal history (including the rape conviction which satisfies the requisite sexual offense conviction under G. L. c. 123A, § 1), which reveals a history of drug and alcohol abuse coupled with acts of violence. Rather, it is also based on Bruno's conduct after the psychiatrists had concluded in 1985 that he was not sexually dangerous and while he was institutionalized. This conduct reveals that: Bruno had refused to pursue sex offender therapy while incarcerated; Bruno's parole was twice revoked for testing positive for drugs; Bruno tested positive for Hepatitis B[14]; and Bruno's parole was another time revoked for being arrested for allegedly assaulting his girl friend with whom he lived, and for possessing a hypodermic needle. Thus, due to the additional evidence contained in the current commitment petition, the issue therein, whether Bruno is currently a sexually dangerous person, is quite different from whether he was sexually dangerous in 1985. For these reasons, we reject Bruno's claim that the Commonwealth is precluded from initiating commitment proceedings against him.

5. *Questions in reported case.* Final judgment entered on Wilson's motion to dismiss, thus rendering the report moot. See *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. (Bermuda)*, 425 Mass. 419, 420-421 (1997). However, it is entirely appropriate for us to decide the issues raised by the report as the parties have requested. The issues concern aspects of the statute's temporary commitment and probable cause hearing procedures on which the statute is silent; are of recurring importance to the administration of justice; and are likely to evade appellate review given the short time periods during which a person may be committed pursuant to these procedures prior to trial. See *Mendonza* v. *Commonwealth*, 423 Mass. 771, 777 (1996). See also *Acting Superintendent of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 103 (2000).

The parties do not challenge the judge's finding that there was probable cause to believe that "Wilson has pedophilia . . .

---

[14]Hepatitis is defined as an "[i]nflammation of the liver; usually from a viral infection . . . ." Stedman's Medical Dictionary 784 (26th ed. 1995). Hepatitis B is one type of viral hepatitis characterized by "a long incubation period," and is "usually transmitted by injection of infected blood or blood derivatives or by use of contaminated needles, lancets, or other instruments." *Id.* at 785, 786.

and that there is a high likelihood that Wilson will continue his uncontrollable desires for and is likely to commit further sexual assaults against young boys," thus requiring his commitment for a period not exceeding sixty days for examination and diagnosis pursuant to G. L. c. 123A, § 13 (a). Rather, the parties challenge various rulings of law the judge made concerning the temporary commitment and probable cause hearing provisions of the statute.

(i) *Standard of proof for temporary commitment.* The first reported question involves the standard of proof required to commit a person temporarily under § 12 (e). The statute merely mentions a "sufficient showing." The judge ruled that the Commonwealth must meet the probable cause to arrest standard articulated in *Jenkins* v. *Chief Justice of the Dist. Court Dep't*, 416 Mass. 221 (1993). Wilson argues that the judge was correct.

The Commonwealth urges us to adopt the reasonable suspicion standard. That standard justifies only a very brief detention quite different from the temporary, though vastly intrusive, detention permitted under G. L. c. 123A, § 12 (e). See, e.g., *Commonwealth* v. *Blais*, 428 Mass. 294, 298 (1998) (officer with reasonable suspicion that person is operating vehicle while under influence may briefly detain person to administer field sobriety tests); *Commonwealth* v. *Barros*, 425 Mass. 572, 585 (1997) (officer who detains person on reasonable suspicion may detain for short period, fifteen minutes, to transport person for identification purposes); *Commonwealth* v. *Salerno*, 356 Mass. 642, 646-647 (1970) (officer who detains persons on reasonable suspicion may hold them for "expedious collateral inquiry which might result in the suspects' arrest or prompt release"). The Commonwealth's reliance on *Lamb, petitioner*, 368 Mass. 491, 496-500 (1975), is misplaced. The issue there was the culpability of the Commonwealth in bringing a case to trial approximately ten months after a sixty-day observation period concluded with two psychiatrists reporting that Lamb was sexually dangerous. The current § 14 (a) addresses such a situation, which has no bearing on the standard of proof required to commit temporarily a person under § 12 (e).

The loss of liberty that one faces even when temporarily committed is "tantamount to the infringement of being arrested." *Glass* v. *Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (emergency commitment for fifteen days under New York

Mental Hyg. Law, § 9.39). See *Ahern* v. *O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997) (emergency commitment for ten days under G. L. c. 123, § 12, implicates the Fourth Amendment as if person were arrested). One cannot lawfully be arrested unless probable cause exists or is shown promptly after the arrest. *Jenkins* v. *Chief Justice of the Dist. Court Dep't, supra* at 227, 232 (in case of warrantless arrest, judicial determination of probable cause made promptly after arrest will satisfy mandate under Fourth Amendment to the United States Constitution and art. 14 of Massachusetts Declaration of Rights).

The Commonwealth alternatively has asked that we consider applying a "special needs" exception to the probable cause requirement similar to that applied in *McCabe* v. *Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 552 (1st Cir.), cert. denied sub nom. *McCabe* v. *Lynn*, 519 U.S. 911 (1996). That case is distinguishable. There, a "special needs" exception permitted officers to enter without a warrant the home of a person for the purpose of detaining her pursuant to G. L. c. 123, § 12 (*a*), after an impartial qualified physician determined her to be dangerous and mentally ill. The issue before the court was not the quantum of proof needed to justify depriving the woman of her liberty, but to justify the warrantless entry onto premises to attend to an emergency situation. Cf. *Ahern* v. *O'Donnell, supra* at 817 (where officer seizes person for emergency involuntary commitment under G. L. c. 123, § 12 [*a*], without expert determination, there must be probable cause to do so). We see no justification for such an exception here. There is no exigency or emergency about the release dates of inmates likely to be the subject of these petitions, except, arguably, during the first few months following the effective date of the statutory amendments. The Commonwealth concedes that the exigency is the lack of time it was given to gather and present all available evidence of sexual dangerousness prior to *these* inmates' release dates, although in Wilson's case it presented some expert evidence at the temporary commitment hearing, and two expert witnesses at the probable cause hearing. The Commonwealth acknowledges that in future cases it should receive six months' notice of an inmate's release date and therefore could obtain the necessary evidence and even complete the final commitment hearing before that date. In such cases the order of commitment would not take effect until the inmate's parole or discharge. See G. L. c. 123A, § 14 (*d*).

The judge ruled that the Commonwealth's burden of proof at the probable cause hearing under § 12 (*c*) is the same as that required for a probable cause, or bind-over, hearing held pursuant to G. L. c. 276, § 38. It is referred to as the "directed verdict" standard. See *Myers* v. *Commonwealth*, 363 Mass. 843, 850 (1973). "The minimum quantum of evidence required by this bind-over standard is more than that for probable cause for arrest but less than would 'prove the defendant's guilt beyond a reasonable doubt.' " *Id.*, quoting *People* v. *Bieber*, 100 N.Y.S. 2d 821, 823 (N.Y.C. Magis. Ct. 1950). Wilson argues for the application of this standard at the § 12 (*c*) hearing. The Commonwealth argues that the probable cause to arrest standard should apply.

The Commonwealth contends that, because the § 12 (*c*) hearing is only a preliminary hearing, much the same as a preliminary parole revocation hearing, the arrest standard should apply. See *Morrissey* v. *Brewer*, 408 U.S. 471, 485 (1972). The Supreme Court held that the arrest standard should apply to a preliminary parole revocation hearing because it was informal in nature and would be followed by a more formal proceeding before the parole board. Such a hearing must be conducted by some impartial person, not necessarily a judge. At the hearing the parolee must be informed of the nature of the alleged parole violations. He has the right to present favorable information by bringing letters, documents, or individuals; he may call and question persons who reportedly gave information on which the parole violation is based. *Id.* at 486-487. Such a hearing is vastly different than the hearing afforded under § 12 (*c*). The latter includes the right to counsel, the right to confront and cross-examine adverse witnesses, and the right to call witnesses. See G. L. c. 123A, § 12 (*d*). It is an adversary proceeding conducted in a formal manner before a judge in the Superior Court, not unlike a trial.

Where a statute is silent as to the standard of proof to be applied at a hearing, our determination of which standard shall apply is not made solely on the basis of the status of the hearing. We are guided by due process considerations, including the nature and complexity of the dispute, the competing interests of the parties, the nature of the hearing provided by statute, i.e., whether it is formal or informal, and its place in the over-all statutory scheme. See *Morrissey* v. *Brewer, supra*; *Jenkins* v. *Chief Justice of the Dist. Court Dep't, supra* at 245. We have

held that the standard of proof in grand jury proceedings is the arrest standard, see *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984), but that the directed verdict standard applies to a bind-over hearing, *Myers* v. *Commonwealth, supra.* Both proceedings are preliminary to trial, and both look to a common end: holding a defendant for trial. The lower standard is suitable to the informal, ex parte nature of grand jury proceedings, whereas the higher standard is more appropriate to the more formal, adversary nature of the bind-over hearing. The § 12 (*c*) commitment hearing is more like the bind-over hearing, with its formal requirements and adversary nature. It also shares with the bind-over hearing statutory requirements for the right to counsel, the right to confront and cross-examine adverse witnesses, and the right to present witnesses on the defendant's behalf. The directed verdict standard is appropriate to this type of proceeding. The judge found that the Commonwealth met that burden, and we are satisfied that his finding was correct.

(ii) *Expert evidence at temporary commitment hearing.* The second reported question involves the need for expert evidence to commit a person temporarily under § 12 (*e*). The statute is silent on the question. The judge concluded such evidence is required, and Wilson argues that the judge was correct. The Commonwealth contends that none is required, relying primarily on insanity defense cases, where the question of a defendant's criminal responsibility may be raised, in some cases, without the need for expert testimony, see *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979), and cases cited, and resolved without any expert testimony. See *Commonwealth* v. *Keita*, 429 Mass. 843, 847 (1999). The analogy is inapt because the Commonwealth is not aided by the "presumption of sanity" in cases under c. 123A, unlike criminal prosecutions, and it must affirmatively prove that the person has the requisite current mental condition. See *id.*

The Commonwealth's burden, as we have said, is the probable cause to arrest standard. "Probable cause to arrest exists when, at the moment of arrest, the facts and circumstances known to the police officers were sufficient to warrant a person of reasonable caution in believing that the defendant had committed or was committing a crime." *Jenkins* v. *Chief Justice of the Dist. Court Dep't, supra* at 242, quoting *Commonwealth* v. *Gullick*, 386 Mass. 278, 283 (1982). See *Gerstein* v. *Pugh*, 420 U.S. 103, 111 (1975). Analogizing to this standard, probable

cause to commit a person temporarily under G. L. c. 123A, § 12 (*e*), exists when the evidence presented, assuming it is true, is sufficient to warrant a judge in believing that the person is a sexually dangerous person. The evidence must meet this standard as to each element of proof, which includes proof that the person currently "suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses." G. L. c. 123A, § 1. Whether a person suffers from a mental abnormality or personality defect, as well as the predictive behavioral question of the likelihood that a person suffering from such a condition will commit a sexual offense, are matters beyond the range of ordinary experience and require expert testimony. See *Commonwealth* v. *Crawford*, 429 Mass. 60, 67 (1999) (error to exclude expert testimony on posttraumatic stress disorder or battered woman syndrome, as not within common experience of ordinary juror); *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 447-448 (1996) (expert testimony required to explain likelihood of transmission of sexually transmissible disease from defendant to victim, being matter beyond ken of ordinary juror).

Because a temporary commitment will be sought in circumstances akin to an emergency to hold a person for a short period until a probable cause hearing is held, the expert evidence required for a temporary commitment need not be in the form of live testimony, and need not be extensive, but it must establish probable cause as to those elements of proof. It is not disputed that the Commonwealth met that burden in Wilson's case. We note that it did so on rather short notice.

(iii) *Duration of temporary commitment absent expert evidence.* In his third reported question the judge asks how long a temporary commitment may be ordered if the Commonwealth fails to adduce expert evidence. He ruled that such a commitment may only last twenty-four hours. Wilson argues that he was correct. We agree, but caution that even a twenty-four hour commitment can be justified only on a showing that is the equivalent of probable cause to arrest. See *Jenkins* v. *Chief Justice of the Dist. Court Dep't, supra* at 236-238. If a petition for commitment under § 12 (*e*) is made without expert evidence meeting the requirements of Part 5 (ii), *supra*, it must be represented to the judge that such evidence exists, is not immediately available for presentation, but will be forthcoming.

(iv) *Duration of temporary commitment.* The fourth reported

question asks how long a person may be temporarily committed under § 12 (*e*) pending commencement of the probable cause hearing under § 12 (*c*) and (*d*). The statute does not address the matter. The judge ruled that it must be brief, without assigning any precise length of time. Wilson again argues that the judge was correct. The Commonwealth argues for a reasonable amount of time, and that ten business days is generally what is needed adequately to prepare for the probable cause hearing.

The judge ordered the probable cause hearing to begin five calendar days after he ordered Wilson's temporary commitment. The parties agreed to extend that date by one week, and the judge acceded to their request. The probable cause hearing commenced twelve days after the temporary commitment. The second day of trial commenced two weeks later due to scheduling problems for one Commonwealth witness.

Due process is a flexible concept capable of "appropriate accommodation of the competing interests involved" in a case. *Lotto* v. *Commonwealth*, 369 Mass. 775, 780 (1976), quoting *Goss* v. *Lopez*, 419 U.S. 565, 579 (1975). See *Commonwealth* v. *Durling*, 407 Mass. 108, 113 (1990), and cases cited. The probable cause hearing under § 12 (*c*) and (*d*) is a formal adversary proceeding. It typically involves proof from various sources, including police reports, probation records, mental health records, social worker records, victim statements, prison records, military records, and of course, securing expert testimony on short notice. A prosecutor may have developed a substantial file on a person while preparing a particular case, but the issue of sexual dangerousness involves matters beyond the typical criminal prosecution and of which the prosecutor initially may have been unaware. Materials are often needed from agencies in other cities, counties, or States. Due to the length of a person's imprisonment, such materials likely will have been placed in a storage facility and not easily retrieved. Although a prosecutor would do well to anticipate bringing a proceeding under c. 123A against a likely candidate by developing the file immediately after prosecution, often that may not be possible. Adequate preparation requires time. There will be considerable demands on both counsel. Defense counsel will also require adequate time to prepare a defense to a probable cause hearing, as the defendant has a substantial interest in his freedom. Society also has a substantial interest, namely, being free from sexual predators (if a defendant is indeed such a person), and seeing that a

defendant is treated with basic fairness. We think, on balance, that ten business days is not an unreasonable period of time, and is approximately the amount of time on which the parties agreed in this case.

We note that a person may be held for ten days under the emergency commitment procedure created by G. L. c. 123, § 12 (*a*), see *Ahern* v. *O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997). Other courts have cited statutes authorizing temporary commitments of ten days, and longer. See e.g., *Luna* v. *Van Zandt*, 554 F. Supp. 68, 71 (S.D. Tex. 1982) (fourteen days); *Bension* v. *Meredith*, 455 F. Supp. 662, 669 (D.D.C. 1978) (not to exceed thirty days); *Doremus* v. *Farrell*, 407 F. Supp. 509, 515 (D. Neb. 1975) (not to exceed sixty days). The brevity of the twenty-four hour requirement in *Jenkins*, on which the judge relied, stemmed from our concern that a person was being held on a determination of probable cause made not by a neutral magistrate, but by a police officer. Such was not the case here. Wilson was held on the judge's order only.

We conclude that absent unusual circumstances, a probable cause hearing should commence no later than ten business days after a temporary commitment order is made under § 12 (*e*). We again note that the Commonwealth generally expects to be able to complete a probable cause hearing before an inmate's discharge date in future cases where it will have received the six-month advance notice of discharge provided by § 12 (*a*).

(v) *Expert testimony at probable cause hearing.* The fifth reported question involves the need for expert testimony at the probable cause hearing. The judge ruled that it is required. We agree. As discussed at Part 5 (i), *supra*, this is a formal adversary proceeding, with the right to cross-examine expressly afforded by § 12 (*d*) (3). The Commonwealth presented two experts at Wilson's probable cause hearing on short notice. Both experts interviewed Wilson, and both opined that he is a sexually dangerous person. The judge credited their testimony and ordered Wilson committed for sixty days under § 13 (*a*).

(vi) *Segregation of persons committed from persons adjudged sexually dangerous.* The sixth reported question asks whether persons committed under §§ 12 (*e*) and 13 (*a*) must be held separately from persons adjudged sexually dangerous. The judge ruled that they must be held separately. In his order for commitment the judge directed that Wilson be held apart from persons adjudged sexually dangerous, but also ordered that Wilson receive treatment while held.

The judge found no facts to support his segregation order, and the record is sparse on the matter. The order appears to be based on (1) a provision in G. L. c. 123, § 35, which states that an alcoholic who is committed thereunder must be "housed and treated separately from convicted criminals," and (2) a requirement that pretrial detainees at the Suffolk County Jail be housed in conditions "superior" to those of inmates under sentence. See *Inmates of the Suffolk County Jail* v. *Eisenstadt*, 360 F. Supp. 676, 686 (D. Mass. 1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied sub nom. *Hall* v. *Inmates of the Suffolk County Jail*, 419 U.S. 977 (1974). The record before us is inadequate as a basis for the judge's segregation order, and does not permit us to give a reasoned and intelligent answer to the question reported. We note, however, that c. 123A does not require a segregation of the type ordered, and that the superintendent of the treatment center has promulgated rules and regulations regarding persons temporarily committed consistent with a management plan for the facility as a whole that comports with constitutional requirements as determined by the United States District Court. See *King* v. *Greenblatt*, 53 F. Supp. 2d 117, 134-137 (D. Mass. 1999). Those regulations provide that persons temporarily committed shall be assigned to an observation unit within the main section of the treatment center, and that they shall be managed in a manner similar to management for the facility as a whole. Management of the treatment center has been committed to the discretion of the Commissioner of Correction, subject to the jurisdiction of the department. See G. L. c. 123A, § 2. There has been no showing that he has abused that discretion in holding those temporarily committed in accordance with those rules and regulations. Nor has there been any showing that the manner and conditions under which those temporarily committed are held is unconstitutional. Similarly, there is no basis for that aspect of the commitment order that directs treatment for Wilson.

6. *Conclusion.* The orders dismissing the petitions seeking commitment of Bruno, Davila, and Wilson are vacated and the cases are remanded to the Superior Court for further proceedings. Those portions of Wilson's commitment order directing that he be held separately and that he receive treatment while under observation are vacated; the order for his commitment for sixty days is in all other respects affirmed.

*So ordered.*