Fecteau, J.
This is an action commenced on August 8,2001, by the District Attorney for the Middle District on behalf of the plaintiff seeking a commitment of the defendant under the provisions of G.L.c. 123A, §12-15. An order was entered that day, under Section 12(e) of said statute, for the temporary commitment of the defendant at the Massachusetts Treatment Center pending hearing and determination of probable cause under the provisions of c. 123A, §12(c). Counsel was appointed for the defendant and the case was scheduled for a hearing to determine whether probable cause exists to believe that the defendant is a sexually dangerous person.[1] After hearing on December 21, 2001, probable cause was found.
The matter came on for trial on January 10 and 13, 2003, before me, sitting without jury. The defendant elected to waive his right to a jury trial under the statute which was accepted by the court after colloquy with the defendant, finding that the waiver of his right to a jury trial was freely, voluntarily and knowingly given.
Upon consideration of the credible evidence, the following findings of fact and rulings of law are made.
FINDINGS OF FACT
The respondent, Donald Beeso (“Beeso”), now age 32, was convicted of a “sex offense” within the meaning of G.L.c. 123A, §1,[2] after entry of a plea of guilt in the Worcester Superior Court on April 8, 1991, to charges of aggravated rape for which he received a sentence of 9 to 12 years in state prison and indecent assault and battery, receiving a sentence of 3 to 5 years concurrent; at the same time, he was also convicted of kidnapping and received a concurrent sentence of 9 to 10 years in state prison. He had not previously been convicted of a designated sexual offense.
The facts of the subject offenses involve an apparent random encounter on the street at approximately 1:30 a.m. between the nineteen-year-old victim and the defendant, also then age 19, and a male companion, who invited the victim to join them. After obtaining some beer, they led her to the roof of an abandoned train station where they physically confined, threatened, assaulted and raped her by multiple and varied acts of intercourse. Although the defendant was charged with only one count of rape, he was accused of oral, vaginal and anal intercourse as well as other contact of a sexual nature and threats.
*694 While there is no dispute whether the defendant has been convicted of a designated sex offense, the parties do contest whether he presently suffers from a mental abnormality or personality disorder as defined by the governing statute and, if so, as a result, whether he would be likely to reoffend sexually if not confined to a secure facility. Six psychologists and one treatment therapist testified during the trial. All of the professional examiners utilized a guided clinical approach to their evaluations, combining traditional clinical analysis and judgment with actuarial factors noted in the relevant literature and accepted by them as scientifically significant.
The Commonwealth, through its experts, Carol Feldman, Ph.D., and Paul Zeizel, Psy.D., contend that the defendant suffers from a personality disorder,[3] namely, anti-social personality disorder. Dr. Zeizel was originally retained by the Commonwealth to evaluate the defendant’s case and to advise the petitioner accordingly, prior to the filing of its petition on August 8, 2001; his original report is dated August 7, 2001. He interviewed the defendant on December 1, 2001, and updated his report, as of December 21, 2001, in preparation for the probable cause hearing at which he testified. He has since re-interviewed the defendant during September 2002. Dr. Feldman was one of the two qualified examiners appointed under the governing statute to examine the defendant following the finding of probable cause.
The defendant called the following experts: Robert Joss, Ph.D., Leonard Bard, Ph.D., and Eric Brown, Psy.D., as well as the second of the two qualified examiners appointed by the Treatment Center following the finding of probable cause, Katrin Rouse, Ed.D.[4] Although all opined that, even if Beeso meets diagnostic criteria for anti-social personality disorder, a diagnosis that most did not seriously dispute, all were of the judgment that such disorder would not make him likely to offend sexually if not confined to a secure facility as it does not coincide with the statutory definition of personality disorder and that there is a lack of evidence that the defendant is presently unable to control his sexual impulses.
All experts recognized the Diagnostic and Statistical Manual, 4th Edition, Text Revised (“DSM-IV-TR”), as widely accepted in the psychological community as a guide for psychological diagnostic criteria; most, when asked, acknowledged that the manual was not intended to be utilized as simple checklists. Indeed, it expresses a specific caution for forensic purposes: “the fact that an individual’s presentation meets the criteria for DSM-IV diagnosis does not cany any necessary implication regarding the individual’s degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one’s behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.” Introduction to DSM-IV-TR, p. xxxiii. The experts presented by the defendant all recognized that although the defendant has a long history of non-sexual offenses, and may even have a high risk of recidivism generally, they all agree that the defendant’s case shows no evidence of a pattern of deep, generalized or entrenched inability to exercise control over sexual impulses.
According to DSM-IV-TR, the diagnostic criteria for antisocial personality disorder is as follows:
A. There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following:
(1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;
(2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;
(3) impulsivity or failure to plan ahead;
(4) irritability and aggressiveness, as indicated by repeated physical fights or assaults;
(5) reckless disregard for safety of self or others;
(6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations;
(7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.
B. The individual is at least age 18 years.
C. There is evidence of Conduct Disorder with onset before age 15 years.
D. The occurrence of antisocial behavior is not exclusively during the course of Schizophrenia or a Manic Episode.
The disorder is generally described as a “pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood.” DSM-IV-TR, p. 701. For this diagnosis to be given, the individual “must have had a history of some symptoms of Conduct Disorder before age 15 years. Conduct Disorder involves a repetitive and persistent pattern of behavior in which the basic rights of others or major age appropriate societal norms or rules are violated. The specific behaviors characteristic of Conduct Disorder fall into one of four categories: aggression to people and animals, destruction of property, deceitfulness or theft, or serious violation of the rules.” Id., at 702. The diagnosis requires evidence of three or more of the 15 criteria:
(1) often bullies, threatens or intimidates others;
(2) often initiates physical fights;
*695 (3) has used a weapon that can cause serious physical harm to others (e.g., a bat, brick, broken bottle, knife, gun);
(4) has been physically cruel to people;
(5) has been physically cruel to animals;
(6) has stolen while confronting a victim (e.g., mugging, purse snatching, extortion, armed robbeiy);
(7) has forced someone into sexual activity;
(8) has deliberately engaged in fire setting with the intention of causing serious damage;
(9) has deliberately destroyed others’ property (other than by fire setting);
(10) has broken into someone else’s house, building or car;
(11) often lies to obtain goods or favors or to avoid obligations (i.e., ‘cons’ others);
(12) has stolen items of nontrivial value without confronting a victim (e.g., shoplifting, but without breaking and entering; forgeiy);
(13) often stays out at night despite parental prohibitions, beginning before age 13 years;
(14) has run away from home overnight at least twice while living in parental or parental surrogate home (or once without returning for a lengthy period)
(15) is often truant from school, beginning before age 13 years.
In addition, the disturbance in behavior causes clinically significant impairment in social, academic, or occupational functioning.
As previously mentioned, all examiners found that Beeso qualifies under the DSM-IV-TR criteria for the diagnosis of anti-social personality disorder although not all agree that his disorder coincides with the statutory definition of personality disorder.
The Commonwealth’s experts are of the opinion that the defendant’s anti-social personality disorder does conform to the statutory definition of personality disorder and that he is likely to reoffend sexually if not confined to a secure facility. Among factors relied upon in arriving at this opinion is the violence of the offense, that it occurred with a victim who was a stranger to the defendant, thus increasing the potential population of future victims, that it involved threats of violence by the defendant as well as multiple and varied acts of sexual contact, and that the defendant has a long history of offending in general and that there is a higher risk of reoffense both generally and sexually with a person who is diagnosed with anti-social personality disorder and under these circumstances. They also note that although the defendant has completed some sex offender treatment, he has not yet qualified for the final, most intensive and important phases of treatment. Moreover, both examiners cite the high number (44) of disciplinary infractions committed by Beeso, including several serious instances of fighting and having contraband weapons, as evidence of his continuing poor adaptation and conformity with the norms and rules of the community in which he is a member, and which violations are further evidence that he has not yet received adequate treatment, does not have an adequate understanding of his disorder, the reasons for his offending and has not yet mastered the control of his impulsive, non-conforming and dangerous behavior. Dr. Feldman adds that the defendant continues to fail to accept full responsibility for his actions and seeks to minimize his offenses by seeking to excuse his actions by his long-standing and acute abuse of alcohol and that he was impelled to go along in this offense by how his co-defendant might view him. In addition, Dr. Feldman found the public location of the offense, given the potential for and the heightened risk of discovery by others, notwithstanding its remoteness, was an additional risk factor indicative of either a deviant arousal on his part or an inability to control his sexual impulses. Both examiners for the Commonwealth conceded that the facts of sexual contact having been initiated by the co-defendant, that the defendant did not actually carry out any of his threats, that since his incarceration he has not received any disciplinary reports of a sexual nature and that this offense was the only sexual offense on his record are indicative of a lower risk of recidivism.
Although Dr. Rouse, one of two qualified examiners appointed by the Treatment Center following the determination of probable cause, found that the defendant suffers from an impulse control disorder, given a long history of offending generally, she believes that there is no evidence upon which to base an opinion that Beeso has an entrenched pattern of sexualized aggression. In addition, among factors found significant to her opinion that the defendant is not sexually dangerous is that he had only one victim of a sexual offense, there were no male nor child victims, he shows no preoccupation with children, and that even when the facts of the governing offense are considered, there is no evidence that the defendant suffers from any paraphilia (sexual dysfunction). The opinion of Dr. Rouse that “it would be difficult to state that he would be likely to reoffend in a sexual manner” must, however, be tempered by the qualification, expressed in her testimony, that her use of the word “likely” was based upon a definition of “more likely than not.”[5]
Dr. Robert Joss, an expert for the defendant, interviewed the defendant in December 2001, and in September 2002. He testified that in his opinion, without minimizing the existence or significance of the several high risk factors discussed above, by the time of his latest interview, that the defendant showed a better grasp of the issues of his offending, shows a willingness to take responsibility for his actions and their consequences and has worked hard to understand the need for and to develop strategies for relapse preven *696 tion than he had in December 2001, an improvement in attitude that Joss ascribes to Beeso’s sincerity regarding the treatment that he has received which is a significant factor lowering the defendant’s risk of sexual reoffending. Among other factors suggestive to Joss of a low risk of sexual recidivism are his age, as he is now into the fourth decade of his life, that the defendant has only one sexual offense and that his pattern of offending generally is only indicative of a risk of generalized but not sexual recidivism. He also found a decrease over time in the number and severity of Beeso’s disciplinary reports while incarcerated to be supportive of the defendant’s increasing maturity and self-control. In Dr. Joss’s opinion, although the defendant “is at high risk of reoffending generally” he “should be considered only at a moderate risk for reoffending in a sexual manner.”[6]
Dr. Leonard Bard, Ph.D, is of the opinion that the defendant “appears to present with a low to moderate risk of reoffending.” He bases this opinion upon positive changes that he finds Beeso to have made in his life since his incarceration, including the treatment programs that he has successfully completed on substance abuse and anger management, as well as having received some fundamental sex offender treatment. He believes that the one sexual offense in his past is not sufficient evidence of an inability to control his sexual impulses, especially given Beeso’s intoxication and involvement with another actor, and that even if Beeso presents with a diagnosis of antisocial personality disorder meeting DSM-IV criteria, neither the criteria nor the diagnosis coincide, in this case, with the statutory requirement for a personality disorder “to result in a general lack of power to control sexual impulses.”
Dr. Eric Brown, the final expert examiner called by the defendant, while acknowledging the factors indicated by the Commonwealth’s experts suggestive of a high risk of recidivism, corroborates Drs. Joss and Bard in their reliance upon and the significance to their opinions regarding the defendant’s abuse of alcohol, the absence of multiple offenses and victims, the absence of male victims, and an absence of any proclivity, before or since the governing offense of “acting out sexually” as factors indicative of a low risk of sexual recidivism. He notes in his report that in “addition to the relative absence of clinical risk factors, the actuarial assessment of risk does not find Mr. Beeso as prone to reoffend if the term ‘likely’ is defined as more than 50% probable that an event will occur.”
Some, but not all experts utilized one or more “actuarial” tests to aid in their evaluations. Among those examiners who applied one or more of the more commonly used actuarial tools for prediction of risk of sexual recidivism,[7] Beeso was found to score in the high range on the “STATIC 99” test (a test that scores on a series of static, or unchanging factors) and in the moderate range when scored on the ”MnSOST-R" test (one that incorporates some dynamic, or variable factors). The defense experts who utilized the test(s) would distinguish the results as requiring further downward adjustment due to variable factors to the defendant’s credit, as opposed to Dr. Zeizel who believes no downward adjustment is warranted.
According to G.L.c. 123A, § 14(d), the Commonwealth has the burden to prove beyond a reasonable doubt that the defendant is a sexually dangerous person, as defined in section one thereof: “a person who has been convicted by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility.” It is not enough for the Commonwealth to prove, without more, that the defendant was or is dangerous, or that there is a likelihood of his reoffending sexually, or that there is a likelihood of his reoffending generally. The statute requires the Commonwealth to prove beyond a reasonable doubt that there presently exists a mental abnormality or personality disorder and, as a result, there is a likelihood that he will offend sexually.
Moreover, according to the statutory definition of sexually dangerous person, the assessment of whether a particular defendant qualifies as such must be made as of the present time. Notwithstanding the use of the past tense to describe whether a defendant “has been convicted” of a designated sexual offense, and indeed it is uncontroverted that the defendant has been so convicted, the operative time for determination of whether the defendant “suffers from” a mental abnormality or personality disorder and for determination of a likelihood of sexual reoffense is the present. Therefore, there must be evidence presented by the Commonwealth, in support of its burden to prove that the defendant is a sexually dangerous person, that the defendant continues to suffer from a mental abnormality or personality disorder at the present time. Here, there is consistent evidence to suggest that the defendant suffers from anti-social personality disorder. Notwithstanding that the statute does not require diagnoses of mental abnormalities or personality disorders be made according to the criteria of the DSM-IV-TR, it does require examination and reports by qualified examiners. If the determination of whether a person is sexually dangerous was simply to require the examination of an historical record of sexual offenses and other relevant historical events, the testimony of experts would likely be unnecessary. Indeed, our Supreme Judicial Court has held that “(w)hether a person suffers from a mental abnormality or personality-defect, as well as the predictive behavioral question of the likelihood that a person suffering from such a condition will commit a sexual offense, are matters beyond the range of ordinary experience and require expert testimony.” Commonwealth v. Bruno, 432 Mass. 489, 511 (2000). Furthermore, given the obvious need for experts, a legislative intent may be inferred that the ultimate determination, although legal, is dependent *697 upon factors found to be scientifically significant in the psychological community.
All experts who testified credited the DSM-IV-TR to be the authoritative source of diagnostic criteria within the community of psychologists and by which they evaluated the defendant. Although the existence of symptoms supportive of the diagnostic criteria for the personality disorder need not be proved beyond a reasonable doubt, the elements of the cause of action, in addition to conviction for a prior sexual offense, require a finding of sexual dangerousness to be made beyond a reasonable doubt: of a personality disorder consistent with the statutoiy definition and that, as a result, the defendant is likely to reoffend sexually unless confined to a secure facility. It is not enough for the Commonwealth to simply prove that the defendant suffers from a personality disorder recognized by the DSM-IV-TR; the Commonwealth must prove beyond a reasonable doubt that the defendant suffers from a “congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses.”
Although the evidence from the psychological experts is generally consistent that Beeso qualifies for a diagnosis of anti-social personality disorder, they are widely disparate in their opinions whether this diagnosis meets or coincides with the statutory definition of a personality disorder and disagree whether there is a likelihood of sexual recidivism unless confined to a secure facility.[8] Specifically, the experts are in sharp disagreement regarding whether there is sufficient evidence of an inability to control sexual impulses, given all the circumstances.
Notwithstanding that the defendant has been convicted of only one sexual offense, the opinions of the Commonwealth’s experts that the defendant generally lacks power to control his impulses in general and sexual impulses in particular, and is likely to offend sexually if not confined to a secure facility rely heavily upon, and the court credits the evidence concerning the gravity of the offense, that it occurred with a stranger, that the violence and threats of violence utilized by the defendant was unnecessarily excessive, the kind and number of criminal convictions of the defendant prior to the offense in question, the kind and number of disciplinary reports since he has been incarcerated and that the defendant has not completed the most intensive and important aspects of sex offender treatment. Although additional opportunity for supervision of the defendant in the context of a criminal sentence, through parole or probation is viewed by experts as a protective element that would lower risk, there is no further supervision of this defendant available under his governing offense. Under all the circumstances and in consideration of all the evidence, the opinions of the experts who testified to the effect that the defendant does not presently suffer from a personality disorder, and/or, that Beeso is not likely, as a result, to reoffend sexually, are not credited.
Upon consideration of all the evidence, the court is satisfied that the Commonwealth has proven that the defendant today suffers from anti-social personality disorder and that it is a “congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses.” Moreover, the Commonwealth has met its burden to prove that, as a result of this personality disorder, the defendant is likely to offend sexually if not confined to a secure facility. The court, therefore, and for the foregoing reasons, finds that the Commonwealth has satisfied its burden to prove, beyond a reasonable doubt, that the defendant is a “sexually dangerous person” as defined in G.L.c. 123A, §1.
ORDER OF COMMITMENT
For the foregoing reasons, I grant the petition of the Commonwealth and order the defendant to be committed to the Massachusetts Treatment Center, under the provisions of G.L.c. 123A, §14(d), for an indeterminate period of a minimum of one day to a maximum of his natural life until discharged pursuant to the provisions of §9 thereof.

 “Sexually dangerous person,” any person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility; (ii) charged with a sexual offense and was determined to be incompetent to stand trial and who suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility; or (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires.

“Sexual offense,” includes any of the following crimes: indecent assault and battery on a child under fourteen under the provisions of section thirteen B of chapter two hundred and sixty-five; indecent assault and battery on a mentally retarded person under the provisions of section thirteen F of chapter two hundred and sixty-five; indecent assault and battery on a person who has obtained the age of fourteen under the provisions of section thirteen H of chapter two hundred and sixty-five; rape under the provisions of section twenty-two of chapter two hundred and sixty-five; rape of a child under sixteen with force under the provisions of section twenty-two A of chapter two hundred and sixty-five; rape and abuse of a child under sixteen under the provisions of section twenty-three of chapter two hundred and sixty-five; assault with intent to commit rape under the provisions of section twenty-four of chapter two hundred and sixty-five: assault on a child with intent to commit rape under section 24B of chapter 265; drugging persons for sexual intercourse under section 3 of chapter 272; unnatural and lascivious acts with a child under the age of sixteen under the provisions of section thirty-five A of chapter two hundred and seventy-two; and any attempt to commit any of the above listed crimes under the *698 provisions of section six of chapter two hundred and seventy-four.

“Personalify disorder” is defined as “a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses.” G.L.c. 123A, §1.

In addition, David Cerces, a treatment therapist, testified on the defendant’s behalf concerning Beeso’s efforts in treatment since at the Treatment Center and regarding his relapse prevention plan.

On December 17, 2002, following preparation of the report of all experts who testified in this case, the decision of the Supreme Judicial Court in the case of Commonwealth v. Boucher, 438 Mass. 274 (2002), was issued, in which the court defined “likely” as “reasonably to be expected in the context of the particular facts and circumstances at hand.” At 276.

In his testimony, he stated that at the time of the writing of his report, in April 2002, he defined “likely” as a probability of at least of 40 to 50%.

The examiners who administered the STATIC 99 were Drs. Zeizel, Joss, Bard and Brown. Those who used the MnSOST-R were Joss and Bard.

Indeed, the DSM-IV-TR specifically warns, at xxii-xxiii of the Introduction:
When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a “mental disorder,” “mental disability,” “mental disease,” or “mental defect.”