## COMMONWEALTH *vs.* DONALD DUBE.
## COMMONWEALTH *vs.* RUBIN SEPULVEDA.

Nos. 02-P-334 & 02-P-457.

Bristol. March 18, 2003. - October 3, 2003.

Present: DOERFER, McHUGH, & MILLS, JJ.

*Sex Offender. Practice, Civil,* Sex offender, Appeal. *Evidence,* Sex offender, Expert opinion. *Probable Cause. Words,* "Sexually dangerous."

This court concluded that the Supreme Judicial Court's decision in *Commonwealth* v. *Bruno,* 432 Mass. 489 (2000), requiring the Commonwealth, in filing a petition seeking to commit a criminal defendant as a sexually dangerous person pursuant to G. L. c. 123A, §§ 2 and 12(*b*), to proffer expert testimony to sustain its burden of making a sufficient showing that the person named in the petition is sexually dangerous both to support an order of temporary commitment pending a probable cause hearing and to support a finding of probable cause, led inescapably to the conclusion that production of expert testimony is necessary to satisfy the Commonwealth's burden of proving sexual dangerousness at a full trial on the merits, which requirement may not be satisfied by producing and cross-examining an expert who has formed an opinion that the defendant is not sexually dangerous [481-487]; therefore, a Superior Court judge properly dismissed separate petitions to commit two criminal defendants, who were nearing completion of their sentences for certain sexual offenses, as sexually dangerous persons, where the defendants established to a certainty that the Commonwealth would be unable to produce expert testimony either to show the existence of probable cause under G. L. c. 123A, § 12(*c*), or to carry its burden of proof at trial [487-489].

PETITIONS filed in the Superior Court Department on December 1, 2000, and December 20, 2001, respectively.

Motions to dismiss were heard by *Patrick F. Brady,* J.

*Sharon L. Sullivan-Puccini,* Assistant District Attorney, for the Commonwealth.

*James L. Sultan* (*Catherine J. Hinton* with him) for Donald Dube.

*Michael Lyons* for Rubin Sepulveda.

McHUGH, J. Donald Dube and Rubin Sepulveda, the defendants in these cases, were convicted and imprisoned for the sexual offenses described below. As the time for their discharge neared, the Bristol County district attorney filed petitions to commit them to the Nemansket Correctional Center (Center) as sexually dangerous persons. See G. L. c. 123A, §§ 2, 12(b). Both petitions were dismissed at preliminary stages because the Commonwealth's expert, joined by every other psychiatric expert who had opined on their status, concluded that they were not sexually dangerous. From those dismissals, the Commonwealth appeals. It urges, first, that we decline to follow the recent Supreme Judicial Court decision in *Commonwealth* v. *Bruno*, 432 Mass. 489 (2000), which held that proof of sexual dangerousness requires expert testimony, and, second, that any requirement for expert testimony may be satisfied by producing and cross-examining an expert who has formed an opinion that the defendants are not sexually dangerous. The Commonwealth's position is wholly without merit and we affirm the judgments of dismissal.

The facts underlying the commitment petitions are as follows.[1] Donald Dube was sentenced to concurrent terms of from not less than twelve and not more than twenty years in State prison on November 13, 1991, following his conviction on two counts of forcible rape of a child and two counts of indecent assault and battery on a child under fourteen.[2] The crimes occurred during a two-year period beginning in 1982 and ending in 1984. The victims were two young girls, one of whom was fourteen in 1984 and the other of whom was twelve. Both girls had been adopted by one of Dube's friends.

At the time he committed the crimes, Dube was a Swansea

---

[1]Because both of these cases were dismissed at the preliminary stages, we draw upon both civil and criminal procedure and look at the facts in the light most favorable to the Commonwealth. See *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982) (motion to dismiss); *Greater Lawrence Sanitary Dist.* v. *North Andover*, 439 Mass. 16, 20-21 (2003) (summary judgment); *Ayasli* v. *Armstrong*, 56 Mass. App. Ct. 740, 749 (2002) (directed verdict).

[2]On the indecent assault and battery charges, Dube received concurrent sentences of from not less than seven and not more than ten years' imprisonment, to be served concurrently with the sentences on the rape charges.

police officer. He was aided in committing the offenses by his wife, also a Swansea police officer. The crimes involved oral, vaginal and anal intercourse, fellatio, and cunnilingus, often while pornographic movies served as a backdrop.[3]

While in prison, Dube steadfastly refused to admit that he had committed the offenses and refused to take part in sexual offender counseling and treatment. Nevertheless, his course of incarceration was entirely incident free. Consequently, on May 22, 2001, the parole board voted to release him on parole and, pursuant to G. L. c. 123A, § 12(*a*), notified the Bristol County district attorney of its intention to do so.

On December 20, 2001, the district attorney responded to the Board's notice by filing a petition to commit Dube to the Center pursuant to G. L. c. 123A, § 12(*e*). In his petition, the district attorney noted that he had engaged a "qualified examiner," see G. L. c. 123A, § 1, to examine Dube and that the examiner had concluded that Dube was not sexually dangerous. The district attorney's petition also stated that Dube had engaged the services of a psychologist who had likewise concluded that he was not sexually dangerous. The district attorney made no suggestion that he intended to seek the advice or opinion of any other qualified examiner or to procure an opinion that Dube was sexually dangerous from some other source. Instead, his petition stated "that [Dube] is in fact a sexually dangerous person and . . . the Commonwealth does not need the opinion of an expert on this issue."

In response to the petition, Dube filed a motion to dismiss on grounds that the petition disclosed on its face the Commonwealth's inability to establish "probable cause [to believe] that the [defendant was] a sexually dangerous person." G. L.

---

[3]Dube's conviction was affirmed on appeal, see *Commonwealth* v. *Dube*, 35 Mass. App. Ct. 1123 (1994). His later motion for a new trial was denied and that denial, too, was affirmed on appeal. See *Commonwealth* v. *Dube*, 54 Mass. App. Ct. 1112 (2002). Dube's wife, who, on one occasion, forced one of the girls to perform a sexual act at gunpoint, was also indicted, tried, convicted, and imprisoned. The girls' adoptive parents were likewise indicted for abusing them. The adoptive father was convicted and served a term in prison, but charges against the adoptive mother were dismissed.

c. 123A, § 12(*c*).[4] A hearing quickly ensued, the motion to dismiss was allowed, and a judgment of dismissal thereafter entered.

The course of proceedings in the second case, involving Rubin Sepulveda, took a different route to a similar destination. Sepulveda was sentenced on November 27, 1990, to a term of from not less than eight and not more than twelve years for rape of a child and had received a concurrent sentence of from not less than eight and not more than ten years for indecent assault and battery on a child under fourteen. The victim was Sepulveda's eleven year old stepdaughter whom he had molested over a two-year period. The testimony at trial revealed oral, vaginal and anal intercourse, fellatio, and cunnilingus. Sepulveda admitted fondling the victim's breast and vaginal areas over her clothing but denied the other charges. There was some suggestion in the police reports that Sepulveda had fondled the breast and vaginal areas of the victim's younger sisters, ages five and six, over their clothing, but no charges to that effect were ever pressed.[5]

On June 9, 2000, the Department of Correction notified the Bristol County district attorney that Sepulveda's anticipated release date was December 26, 2000.[6] Again, the district attorney responded with a petition for Sepulveda's commitment as a sexually dangerous person. This time, however, the Com-

---

[4]Specifically, the defendant's motion alleged that the Commonwealth would be unable to carry the burden necessary "to commit the defendant," i.e., the burden required either to commit him temporarily under c. 123A, § 12(*e*), pending a probable cause hearing in accordance with § 12(*c*), or to commit him for examination pursuant to G. L. c. 123A, § 13(*a*), following a finding of probable cause. The Commonwealth's burden under § 12(*e*) may not be as heavy as the burden under § 12(*c*), see *Commonwealth* v. *Bruno*, 432 Mass. 489, 511 (2000); *Commonwealth* v. *Reese*, 438 Mass. 519, 524-525 (2003), and, because the § 12(*e*) determination simply deals with whether the defendant will be in custody or at liberty until the conclusion of the § 12(*c*) hearing, we treat the defendant's motion as asserting that the Commonwealth would not be able to establish probable cause under § 12(*c*).

[5]On appeal, Sepulveda's conviction was affirmed. See *Commonwealth* v. *Sepulveda*, 35 Mass. App. Ct. 1109 (1993). Because Sepulveda began abusing the victim in New Jersey, he was prosecuted there for similar offenses, convicted, and given a sentence that ran concurrently with his Massachusetts sentences.

[6]Like Dube, Sepulveda denied that he had committed the offenses and declined to participate in sex offender counseling while in prison. Unlike

monwealth supported its petition with a qualified examiner's report opining that Sepulveda was sexually dangerous.[7] The qualified examiner was the same person who had rendered the negative opinion in Dube's case. At a subsequent hearing, a judge of the Superior Court found probable cause to believe that Sepulveda was sexually dangerous and ordered him committed to the Center for examination and diagnoses pursuant to G. L. c. 123A, § 13(*a*).

During his ensuing commitment, Sepulveda was examined by two qualified examiners who then filed with the court reports in which they opined that he was not sexually dangerous. The Commonwealth's examiner, who had based his original opinions solely on analysis of records pertaining to Sepulveda's case, then interviewed Sepulveda. Following the interview, the examiner changed his opinion and joined the two other qualified examiners in concluding that Sepulveda was not sexually dangerous.[8]

At that point, Sepulveda filed a motion to dismiss the petition or for summary judgment.[9] He attached to that motion reports of two additional psychologists who, after examining him, concluded that he was not sexually dangerous, raising to five the number of examiners who held that undisputed opinion. After a hearing, a Superior Court judge allowed the motion on grounds that, without expert testimony, the Commonwealth could not meet its burden of proof at trial. The record contains no suggestion that the district attorney proffered at the hearing a new expert with a different opinion or suggested that new expert

Dube, however, Sepulveda incurred a total of eight prison disciplinary reports, growing out of three separate incidents.

[7]The Superior Court record contained only a single page letter from the examiner setting out his conclusions. The Commonwealth has moved, without opposition, to expand the record on appeal to include the full text of the examiner's underlying report. We allow that motion and have examined the report in its entirety.

[8]The record contains no report to that effect. Nevertheless, both in the Superior Court and here, the Commonwealth agreed that, after interviewing Sepulveda, its examiner formed the opinion that he was not sexually dangerous.

[9]Summary judgment is a creature of the Massachusetts Rules of Civil Procedure, which are inapplicable to proceedings under G. L. c. 123A. See Mass.R.Civ.P. 81(a)(1)(8), as appearing in 423 Mass. 1412 (1996).

information regarding Sepulveda's sexual dangerousness would be forthcoming at trial.

That is the record upon which the Commonwealth prosecutes these appeals. In urging reversal, the Commonwealth first claims that no expert testimony is required to prove sexual dangerousness at trial and, thus, that dismissal of the petitions at a preliminary stage for want of such testimony or evidence was improper. Two years ago, the Supreme Judicial Court decided *Commonwealth* v. *Bruno*, 432 Mass. 489 (2000). There, the court explored in some detail many of the provisions of G. L. c. 123A. In the course of its exploration, the court made plain that a district attorney is not permitted to file a petition for commitment as a sexually dangerous person based solely on the fact that a person has been convicted of a sexual offense. *Id.* at 503. Instead, said the court, the statute required the district attorney to "make a 'sufficient showing' based on 'evidence before the court,' that the person named in the petition is sexually dangerous." *Ibid.* For that reason, the court said, the commitment petition had to be based on facts sufficient to support the ultimate determination and could not rest on mere averments. *Ibid.*

Because the statutory definition of "sexually dangerous" focuses on whether an individual suffers from a "mental abnormality or personality disorder" and on a predictive judgment about the likelihood that the individual will cause future harm, G. L. c. 123A, § 1,[10] the court also held that the requisite showing required the Commonwealth to proffer expert testimony

---

[10]In pertinent part, that statute provides:

" '[A s]exually dangerous person' [is] any person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility; (ii) charged with a sexual offense and was determined to be incompetent to stand trial and who suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility; or (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the

both to support an order of temporary commitment pending a probable cause hearing, *id.* at 511, and to support a finding of probable cause, *Commonwealth* v. *Bruno*, 432 Mass. at 513. See G. L. c. 123A, § 12(*c*), (*e*). Underscoring that requirement, the court, about a year later, held that a finding of probable cause required, overall, judicial satisfaction

> "first, that the Commonwealth's admissible evidence, if believed, satisfie[s] all of the elements of proof necessary to prove the Commonwealth's case [and s]econd, . . . that the evidence on each of the elements is not so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it to conclude that the Commonwealth had met its burden of proof."

*Commonwealth* v. *Reese*, 438 Mass. 519, 524 (2003), quoting from *Commonwealth* v. *Blanchette*, 54 Mass. App. Ct. 165, 175 (2002).

To be sure, both *Bruno* and *Reese* focused on the kind and quality of evidence required at pretrial proceedings, not at trials. *Bruno*, therefore, does not squarely hold that production of expert testimony is necessary to satisfy the Commonwealth's burden of proving sexual dangerousness at a full trial on the merits. Nevertheless, the conclusion that it must do so is inescapable. If a finding of sexual dangerousness requires exploration of mental or personality disorders and predictions about future behavior, if expert testimony is required for a finding of probable cause to commit a person to the Center, and if the statutory purpose for commitment is "examination and diagnosis under the supervision of two qualified examiners," i.e., board certified psychiatrists or licensed psychologists, see G. L. c. 123A, §§ 1, 13(*a*), then it is scarcely possible that the need for expert testimony does not persist through trial. Indeed, the entire statutory scheme creates the mechanism for gathering the facts and conducting the analysis integral to that testimony.

No doubt sensing that *Bruno* creates a momentum that carries

---

age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires."

the requirement for expert testimony through trial, the Commonwealth pursues its claim that dismissal in these cases was improper not by asking us to confine *Bruno* to preliminaries — a confinement that, in any event, would be of little utility in Dube's case — but by asking us to overrule it.[11] It tells us that the Supreme Judicial Court "offered no support for [its] assertion" that expert testimony was required to prove sexual dangerousness,[12] and that the requirement was "a mere policy decision . . . very dangerous to public safety." It analogizes proof of sexual dangerousness to proof of criminal responsibility, ignoring in the process the court's rejection of that analogy on grounds that proof of the latter, unlike proof of the former, is aided by the presumption of sanity. *Bruno*, 432 Mass. at 510.[13] Finally, in trial court papers, the Commonwealth supported its

---

[11]Although the Commonwealth asks us to overrule *Bruno*, it did not seek direct appellate review of the trial court decisions here at issue. See Mass.R.A.P. 11, as amended, 426 Mass. 1601 (1998). The Commonwealth informed us at oral argument that internal discussions produced its election to forgo an application for direct appellate review and instead to pursue its appeal in this court.

[12]The Commonwealth's basis for making that statement is simply unfathomable for, to the extent "support" is not woven into the fabric of both the statute and the opinion, it was set forth in the very passage the Commonwealth attacks. Here is that passage:

"Whether a person suffers from a mental abnormality or personality defect, as well as the predictive behavioral question of the likelihood that a person suffering from such a condition will commit a sexual offense, are matters beyond the range of ordinary experience and require expert testimony. See *Commonwealth* v. *Crawford*, 429 Mass. 60, 67 (1999) (error to exclude expert testimony on posttraumatic stress disorder or battered woman syndrome, as not within common experience of ordinary juror); *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 447-448[, cert. denied, 519 U.S. 1015 (1996)] (expert testimony required to explain likelihood of transmission of sexually transmissible disease from defendant to victim, being matter beyond ken of ordinary juror)."

*Bruno*, 432 Mass. at 511.

[13]The Commonwealth also sets out a long list of civil cases in which this court and the Supreme Judicial Court held that expert testimony was not required to prove one thing or another without making any effort to show the relationship between those cases and these. In the aggregate, therefore, the list stands for the proposition that expert testimony is not required to prove many things, a proposition with which no one can quarrel, but the untailored asser-

claim that no expert testimony was required to prove its case with the following reference to the New Testament:

> "As Jesus recognized, '[y]e shall know them by their fruits. Do men gather grapes of thorns, or figs of thistles? Even so every good tree bringeth forth good fruit; but a corrupt tree bringeth forth evil fruit.' St. Matthew, 7:16-20. The defendant's actions and admissions are the 'fruits' by which the jury will know him."[14]

In the brief it filed here, the Commonwealth, abandoning the New Testament, supported the same proposition by quoting poet and songwriter Bob Dylan's observation that "you don't need a weatherman to know which way the wind blows."[15]

Totally missing from all this — indeed, totally missing from any of the papers the Commonwealth filed in either of these

---

tion of which provides no support for the position the Commonwealth advocates.

[14]The docket does not reference the brief in which that quotation appears. The brief, however, was included, without objection, in the defendant's supplemental appendix.

[15]We note, without comment, that Dylan made his now well-known observation in the following context:

"Maggie comes fleet foot
Face full of black soot
Talkin' that the heat put
Plants in the bed but
The phone's tapped anyway
Maggie says that many say
They must bust in early May
Orders from the D.A.
Look out kid
Don't matter what you did
Walk on your tip toes
Don't try 'No Doz'
Better stay away from those
That carry around a fire hose
Keep a clean nose
Watch the plain clothes
You don't need a weather man
To know which way the wind blows."
    Bob Dylan, Subterranean Homesick Blues (1965).

cases — is any authority for this court's power to overrule a decision of the Supreme Judicial Court or to decline to follow the holding of that court's opinions. When pressed on the point during oral argument, the Commonwealth asserted that this court's power to do so rested not on precedent but on "common sense and logic."[16]

Common sense is not the label that leaps immediately to mind upon hearing that argument. On the contrary, we held fourteen years ago that "[t]he Commonwealth's argument that this court should overrule the Supreme Judicial Court's decision . . . is frivolous, as we lack any such power." *Commonwealth* v. *Healy,* 26 Mass. App. Ct. 990, 991 (1988). In fact, from the very earliest decisions we issued and continuing to this day, we have uniformly and unequivocally held we have no power to alter, overrule or decline to follow the holding of cases the Supreme Judicial Court has decided. See *Burke* v. *Toothaker,* 1 Mass. App. Ct. 234 (1973) (as an intermediate appellate court, Appeals Court does not alter established rules of law); *Gerber* v. *Worcester,* 1 Mass. App. Ct. 811 (1973) (unless overruled by the Legislature or the Supreme Judicial Court, Appeals Court is bound by existing doctrine); *Commonwealth* v. *Dominico,* 1 Mass. App. Ct. 693 (1974) (settled practice must be changed by the Supreme Judicial Court or the Legislature); *Commonwealth* v. *Meranda,* 2 Mass. App. Ct. 890 (1974) (declining invitation to disregard rule stated by the Supreme Judicial Court); *Commonwealth* v. *Pugh,* 2 Mass. App. Ct. 903 (1974) (request for rule change should be made to the Supreme Judicial Court); *Fo-*

---

[16]The portion of the oral argument in which the Commonwealth made that assertion was as follows:

> Q. "Where in the history of Anglo-American jurisprudence does the District Attorney find support for [the] proposition [that this court has the power to disregard an opinion of the Supreme Judicial squarely on point]?"
>
> A. "He finds it in common sense and logic."
>
> Q. "To the disregard of settled ways of adjudicating precedent that's been in Anglo-American jurisprudence since the founding of this Republic, is that right?"
>
> A. "Yes, your Honor."

*ley* v. *Evans*, 30 Mass. App. Ct. 509, 513 n.5 (1991) (Appeals Court is "bound to follow the decisions of the Supreme Judicial Court"); *Commonwealth* v. *Colon*, 52 Mass. App. Ct. 725, 730 n.1 (2001) ("As an intermediate appellate court . . . we are bound to follow the decisions of the Supreme Judicial Court"). These cases were available to the Commonwealth, they were "directly adverse" to the Commonwealth's position, and the Commonwealth's briefs contain not a single citation to any of them. See Mass.R.Prof.C. 3.3(a)(3), 426 Mass. 1383 (1998) ("Candor Toward the Tribunal").

We recognize that Mass.R.A.P. 11, as amended, 426 Mass. 1601 (1998), providing for direct appellate review, contains an option, not a command, even when, as here, the result a party advocates cannot be achieved without alteration of a rule the Supreme Judicial Court alone has the power to change. See note 11, *supra*. We also recognize the possibility that, if the Supreme Judicial Court hears a case on further appellate review, the parties may not have an opportunity to file additional briefs, see Mass.R.A.P. 27.1(f), as amended, 367 Mass. 922 (1975), and that prudent counsel may therefore include in briefs filed here arguments that the higher court alone has the power to consider. But while the case is pending here, candor toward this tribunal requires frank recognition of clearly settled limitations on judicial power, not advocacy of unprincipled and essentially lawless results.

The Commonwealth's second argument makes no more sense than its first. In essence, the Commonwealth argues that it may fulfill the *Bruno* requirement for producing expert testimony by offering at trial the opinion of an expert witness who disagrees with the conclusion it seeks to have the fact-finder reach.[17] Understandably, the Commonwealth provides no support for that proposition either. Indeed, when asked at oral argument whether it was aware of any case in any common-law jurisdic-

---

[17]More specifically, the Commonwealth's brief asserts that if it is required to produce expert testimony, that expert testimony need not include an opinion that the defendant is sexually dangerous. At oral argument, the Commonwealth expanded on that proposition by asserting that the expert opinions it had proffered in these cases could satisfy its obligation to produce expert testimony notwithstanding the fact that the experts in both cases opined that the defendant was not sexually dangerous.

tion in the world that would support its argument, the Commonwealth responded "no, but maybe this is the case."

It is not. The requirement for expert testimony to prove matters generally unfamiliar to those without particularized learning originates in the common-law principle that "where the tribunal is faced with a fact-finding problem, we confide ourselves to a rational process[.]" Hughes, Evidence § 281, at 333 (1961). Adherence to a rational process typically requires not only expert testimony regarding general principles with which lay-people are unfamiliar, but also testimony regarding "inferences from highly technical or specialized facts which the fact-finder . . . would not be competent to draw." Hughes, *supra* at § 702.6. See McCormick, Evidence § 13, at 58 (5th ed. 1999) (assistance requires the expert to draw inferences from the facts "which a jury could not draw at all or as reliably"). As the Supreme Court of the United States put it in *Addington* v. *Texas*, 441 U.S. 418, 429 (1979):

> "[w]hether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists" (emphasis in original).

In a rational process, one cannot prove a case by producing opinions directly contradicting the conclusion one seeks to have the fact-finder reach. Disbelief of such opinions simply furnishes no "basis for a finding the other way." *Commonwealth* v. *Haggerty*, 400 Mass. 437, 442 (1987), quoting from *Stuart* v. *D.N. Kelley & Son, Inc.*, 331 Mass. 76, 78 (1954). Consequently, the Commonwealth cannot prove that a person is sexually dangerous by producing the expert testimony of someone who opines that he is not.

The single, unresolved question these cases present — a question the Commonwealth's briefs do not address — thus becomes whether dismissal of a petition is appropriate when a defendant establishes to a certainty, as the defendants did here, that the Commonwealth will be unable to produce the expert testimony it must produce either to show the existence of probable cause under G. L. c. 123A, § 12(*c*), or to carry its burden

of proof at trial. The provisions of G. L. c. 123A do not contain explicit directions regarding what happens to a petition under those circumstances.

Lack of express direction notwithstanding, we believe that dismissal of the petition is appropriate under both circumstances.[18] By setting up a statutory scheme first involving temporary detention until probable cause can be determined, then proceeding to detention after a finding of probable cause until examinations are completed and then proceeding to detention, supported by a compilation of the examination reports, until completion of trial, all with specified time limits, see G. L. c. 123A, §§ 12(*e*), 13(*a*), 14(*a*), the Legislature conditioned a petition's progress on the Commonwealth's ability to provide, with increasing degrees of rigor, evidence that the defendant is sexually dangerous. Implicit in the statutory plan for ordered progress is that dismissal of the petition is the appropriate remedy when the Commonwealth's evidence, extant or reasonably anticipated, is demonstrably insufficient to allow it to proceed to the succeeding step. Cf. *Commonwealth* v. *Kennedy*, 435 Mass. 527 (2001) (dismissal after a finding of probable cause was appropriate where the Commonwealth failed to produce reports of qualified examiners within the statutory deadline); *Commonwealth* v. *Reese*, 438 Mass. at 525 (probable cause inquiry enables the judge "to determine whether the evidence . . . is of suitable quality to allow the action to proceed further").

In Dube's case, the evidence was insufficient to support a

---

[18]A motion to dismiss, like the motion the defendants made here, is an appropriate procedural device for raising the issue. As noted, see note 9, *supra*, although these proceedings are "civil" in nature, the Rules of Civil Procedure are inapplicable. Nevertheless, "a judge has inherent power, not derived from any rule, to dismiss a [civil] complaint on his or her own initiative." *National Grange Mut. Ins. Co.* v. *Walsh*, 27 Mass. App. Ct. 155, 157 (1989). Although that power must be exercised sparingly, its exercise is appropriate when a defendant demonstrates that the Commonwealth cannot possibly meet the burden required for success at the next procedural step, whether that step is a hearing on probable cause or the trial itself. See generally *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). The preclusive impact of allowing such a motion is not before us and we express no opinion on that subject. See generally *Commonwealth* v. *Travis*, 372 Mass. 238 (1977); *In re Hill*, 422 Mass. 147, 151-155, cert. denied, 519 U.S. 867 (1996). Compare *Commonwealth* v. *Purdy*, 408 Mass. 681 (1990).

finding of probable cause, for the Commonwealth neither had nor professed an ability to obtain the opinion of any expert that Dube was sexually dangerous. In Sepulveda's case, although the Commonwealth initially obtained the opinion of a qualified examiner that Sepulveda was sexually dangerous, that opinion was withdrawn when, after further examination, the examiner reached precisely the opposite opinion, joining in the process the other four examiners, and the Commonwealth offered no suggestion that it would be able to produce the required opinion at trial.[19] Consequently, both actions were properly dismissed.

*Judgments affirmed.*

---

[19]In Sepulveda's case, the Commonwealth points to the provision of G. L. c. 123A, § 14(c), stating that the Commonwealth may introduce at trial "psychiatric and psychological records and reports of the person named in the petition, including the report of any qualified examiner" and suggests that § 14(c) allows it to proceed on the report the qualified examiner produced for the probable cause hearing notwithstanding the examiner's disavowal of that report upon further examination. Even if the Commonwealth is correct on the question of admissibility, no reasonable person could base a conclusion that Sepulveda was sexually dangerous on an opinion withdrawn by its originator after his discovery that he had not taken into account all of the facts. See generally *Commonwealth* v. *Reese*, 438 Mass. at 524.